**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No.

ADREAAN DAVEL, and
JAKOBUS VICTOR,

      Plaintiffs,

v.

GREENBANK HARVESTING, LLC,
GREENBANK, INC.,
GREENBANK MOBILE WHEAT CLEANING LLC,
GREENBANK TRUCKING, LLC,
MILTON GREENBANK, and
BETH GREENBANK,

      Defendants.

---

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

---

Plaintiffs Adreaan Davel ("Plaintiff Davel") and Jakobus Victor ("Plaintiff Victor" collectively with Plaintiff Davel, "Plaintiffs"), through their attorneys Jenifer Rodriguez and Lauren Shapiro of Colorado Legal Services, make the following allegations in support of their Complaint and Jury Demand:

### PRELIMINARY STATEMENT

1.    This is an action for unpaid minimum wages, overtime wages and contract damages brought by two South African workers who were employed by Greenbank Harvesting, LLC, Greenbank, Inc., Greenbank Mobile Wheat Cleaning LLC, Greenbank Trucking, Milton Greenbank, and Beth Greenbank (collectively "Defendants") through the H-2A Visa Program.

2.      Plaintiffs were brought to the United States to work for Defendants as H-2A agricultural machine operators.  Upon arrival, Plaintiffs were instead put to work hauling bulk commodities for long distances in semi-trucks and driving more than thirteen hours a day. Plaintiffs spent the other portion of their contract performing non-exempt, non-agricultural work and working over 60 hours a week.

3.      Plaintiffs were not paid at all for several of the weeks they performed long-haul truck driving, nor were they reimbursed for all the out of pocket expenses associated with the long-haul truck driving Defendants required them to pay.  Plaintiffs were also not paid overtime premiums for all the hours they worked in excess of 40-hour weeks and 12-hour days when performing grain cleaning.

4.      Defendants failure to pay Plaintiffs the proper wages was not only a violation of federal and state wage laws, it was a violation of the parties' employment contracts.  Defendants further breached the employment contracts by failing to properly reimburse Plaintiffs for their inbound and outbound travel expenses and by not providing Plaintiffs with meals during their employment.

5.      Plaintiffs bring this action to recover damages for injuries inflicted by Defendants under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., the Colorado Wage Claims Act ("CWCA"), Colo. Rev. Stat. § 8-4-101 *et seq.,* and common law claims under Colorado law for breach of contract, promissory estoppel and unjust enrichment.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question), the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).  Plaintiffs respectfully

request that this Court exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under the Colorado Wage Claim Act ("CWCA"), Colo. Rev. Stat. § 8-4-109.

7.      Venue is proper pursuant to 28 U.S.C. § 1391.  A substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado. Defendants Milton Greenbank and Beth Greenbank reside in Colorado. Defendants Greenbank Harvesting, LLC ("Greenbank Harvesting"), Greenbank, Inc., and Greenbank Trucking, LLC ("Greenbank Trucking") are registered Colorado companies. Upon information and belief, Defendant Greenbank Mobile Wheat Cleaning LLC is a Colorado company.

## PARTIES

8.      At all times relevant hereto, each Plaintiff is a citizen of South Africa who was lawfully admitted to the United States on a temporary work visa as a machine operator pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H-2A visa").

9.      Plaintiff Davel is a citizen of South Africa and was employed by Defendants as a temporary foreign agricultural worker on an H-2A visa from May 2017 to December 2017 and again from April 2018 to December 2018.  Plaintiff Davel was also employed by Defendants on an H-2A visa in 2016.

10.      Plaintiff Victor is a citizen of South Africa and was employed by Defendants as a temporary foreign agricultural worker on an H-2A visa from June 2017 to December 2017 and again from June 2018 to December 2018.

11.      Defendant Greenbank Harvesting is a Colorado Limited Liability Company with its principal office located at 2655 E. Bijou Ave., Fort Morgan, CO 80701.

12.     Upon information and belief, Greenbank Harvesting is owned and managed by Defendants Milton Greenbank and Beth Greenbank.

13.     Defendant Greenbank Trucking is a Colorado Limited Liability Company with its principal office located at 2655 E. Bijou Ave., Fort Morgan, CO 80701. Upon information and belief, Greenbank Trucking is owned and managed by Defendants Milton Greenbank and Beth Greenbank.

14.     Defendant Greenbank, Inc. is a Colorado Corporation with its principal office located at 2655 E. Bijou Ave., Fort Morgan, CO 80701.  Upon information and belief, Greenbank, Inc. is owned and managed by Defendants Milton Greenbank and Beth Greenbank.

15.     Upon information and belief, Defendant Greenbank Mobile Wheat Cleaning LLC is a Colorado Limited Liability Company owned and managed by Defendants Milton Greenbank and Beth Greenbank.

16.     Defendant Milton Greenbank ("Defendant Milton Greenbank") is an individual residing in Colorado.

17.     Upon information and belief, Defendant Milton Greenbank owns and operates Greenbank Harvesting, Greenbank Trucking, Greenbank, Inc., and Greenbank Mobile Wheat Cleaning LLC (the "Greenbank Entities").

18.     Defendant Milton Greenbank exercises control over the day-to-day business operations of the Greenbank Entities.

19.     At all times relevant to this Complaint, Defendant Milton Greenbank assigned Plaintiffs to work at different times for the various companies described above.

20.     Defendant Milton Greenbank assigned and supervised Plaintiffs' work for Defendants.

21.     Defendant Milton Greenbank possessed and exercised the authority to establish and modify the Plaintiffs' work schedules.

22.     Defendant Milton Greenbank established and modified the pay rates the Plaintiffs received.

23.     Defendant Milton Greenbank was an employer of Plaintiffs at all times relevant to this Complaint.

24.     Defendant Milton Greenbank is married to Defendant Beth Greenbank.

25.     Defendant Beth Greenbank is an individual residing in Colorado.

26.     Defendant Beth Greenbank assisted in the day-to-day business operations of the Greenbank Entities and matters of the Plaintiffs' employment.

27.     Upon information and belief, Defendant Beth Greenbank was an employer of Plaintiffs at all times relevant to this Complaint.

28.     The Greenbank Entities constitute an enterprise engaged in commerce pursuant to the FLSA as they have unified operations and common control for common business purpose, specifically, operation of heavy machinery for hauling grain and obtaining income through grain cleaning and hauling produce, all conducted as part of business operations.  The Greenbank Entities are jointly operated and managed day-to-day by Defendants Milton and Beth Greenbank (collectively, the "Individual Defendants"), and are each owned by the Individual Defendants as described above.

29.     Upon information and belief, the Greenbank Entities employ several individuals who perform work for all four entities throughout the year.

30.     At all times relevant to this Complaint, all Defendants employed employees who engaged in commerce and/or who handled, sold, or worked on goods and materials that had been moved in or produced for commerce.

## STATEMENT OF FACTS

31.     Defendants do not own or operate a farm and are not farmers.

32.     Defendants provide labor or services to farms and other businesses such as cleaning grain at grain elevators, large storage facilities and other businesses.

33.     Defendants' employees operate the machinery and equipment to provide these services.

34.     Defendants also utilized their employees to haul bulk commodities in semi-trucks to and from farms, factories and industrial sites, in Colorado and several other states.

35.     Upon information and belief, Defendants employed approximately four machine operators including semi-truck drivers, two mechanics and two office personnel over the course of each year relevant to this Complaint.

36.     Defendants employed Plaintiffs in 2016, 2017 and 2018 through the H-2A Visa Program.

37.     While employed by Defendants, Plaintiffs were assigned tasks by and were supervised by Defendants Milton Greenbank and Beth Greenbank.

38.     Defendants' employees Charlene Scheneman and Karen Jensen assisted Defendants in payroll, bookkeeping and supervising Plaintiffs' work and expenses.

**Defendants' Use of the H-2A Visa Program**

39.    Since at least 2016, Defendants have utilized the H-2A Visa Program ("H-2A program") to acquire a steady supply of temporary foreign workers ("H-2A workers").

40.    An agricultural employer in the U.S. may bring H-2A workers to the U.S. if the U.S. Department of Labor ("USDOL") certifies that (a) there are not enough U.S. workers to fill the jobs, and (b) the employment of H-2A workers will not adversely affect the wages and working conditions of U.S. workers who are similarly employed.    8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1).   These provisions, along with the implementing federal regulations, are commonly referred to as the H-2A program.

41.    Under the H-2A program, employers must file a *Temporary Labor Certification Application* ("H-2A Application") with the USDOL's Employment and Training Administration. 20 C.F.R. § 655.130.  The application must include a job offer, known as a "Job Order," which is used in the recruitment of both U.S. and H-2A workers and is incorporated into the work contract of the employed workers.  *See* 20 C.F.R. § 655.103(b) (definition of "work contract").

42.    If an employer's Job Order meets the minimum federal regulatory requirements and is otherwise valid, and if it is determined that sufficient U.S. workers are not available to fill the jobs after good faith recruitment efforts, the USDOL certified the need for the H-2A workers and the U.S. Department of Homeland Security ("DHS") issues H-2A visas for the number of job opportunities the employer was unable to fill by U.S. workers.

43.    The Job Order, must include, among other things, the employer's offer to (a) provide housing that meets program requirements; (b) provide meals or cooking facilities; (c) reimburse transportation and subsistence expenses to and from the worker's home; (d) pay

workers at least twice monthly and pay wages when due; (e) pay the worker the higher of the Adverse Effect Wage Rate ("AEWR"), the prevailing wage, or the amount required by state and federal wage laws; (f) not make deductions from pay for any items purchased primarily for the benefit or convenience of the employer; (g) keep accurate and adequate pay records of the worker's earnings; and (h) provide a written statement on or before each payday indicating, among other things, rate of pay, hours worked, and an itemization of deductions from the worker's wages. 20 C.F.R. §§ 655.121(a)(3), 655.122, and 653.501.

44.     The Job Order must also specify all deductions, other than those required by law, which the employer will take from the worker's paycheck.  20 C.F.R. § 655.122(p)(1).

45.     In the H-2A Application, submitted after the Job Order, the employer is required to attest, among other things: (a) that it has contractually forbidden any foreign recruiter it directly or indirectly engages from seeking or receiving any compensation from recruited workers; (b) that it will comply with all applicable local, state and federal laws; and (c) that it will not "intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against . . . any person who has with just cause" exercised his rights under the employment contract. 20 C.F.R. § 655.135.

46.     Because Defendants are not a fixed-site employer, an agricultural association or an employee of a fixed-site employer or agricultural association, Defendants are classified as H-2A Labor Contractor ("H-2ALC") for purposes of the H-2A program and as such, must comply with the additional filing requirements set forth at 20 C.F.R. § 655.132.

47.     The terms of employment set forth in an employer's Job Order and H-2A Application, including payment of the higher of the AEWR, the prevailing wage, or the

minimum wage required by state and federal wage laws; are incorporated by regulation and by operation of law into the contracts under which workers are employed. 20 C.F.R. § 655.122(q).

48.     The minimum wage requirements of the FLSA apply independently of the H-2A requirements and impose obligations on employers regarding payment of wages. 20 C.F.R. § 655.122(h)(1).

49.     Upon information and belief, each year since at least 2016, Defendant Greenbank Harvesting submitted Job Orders and H-2A Applications to hire H-2A workers to fill the machine operator positions with Defendants.

50.     Each year, Defendants signed these Job Orders and H-2A Applications as the prospective employer and as such, represented that it would comply with all legal obligations of an employer of H-2A workers, including payment of the proper wage.

51.     Upon information and belief, CV Personnel Placement and Recruiting Agency ("CV Personnel") assisted Defendants in recruiting and/or hiring individuals in South Africa to fill H-2A machine operator positions during the years 2016 through 2018.

52.     For the year 2018, Defendants submitted a Job Order and H-2A Application with dates of need ranging from March 1, 2018 through November 30, 2018, seeking at least seven H-2A workers to work as machine operators.

53.     Defendants' 2018 H-2A Job Order and H-2A Application under which Plaintiffs were hired indicated that the jobs to be performed were entirely agricultural machine operator positions, and included the following job description:

> [O]perate self-propelled custom class harvesting machines to harvest a variety of grain and oilseed crops. Adjusts speed of cutters, blowers and conveyers and height of cutting head, using hand tools. Changes cutting head as appropriate for crops, drives heavy truck to transport produce to elevator or storage area. Drives

transporter truck to haul harvesting machines between worksites. Services machinery, and makes in field repairs.

54.     For the year 2017, Defendants submitted an H-2A Application indicating dates of need ranging from April 2, 2017 through December 1, 2017, seeking at least five H-2A workers to work as equipment operators under the same job description set forth in Paragraph 53.

55.     Upon information and belief, Defendants' 2016 Job Order and H-2A Application included dates of need similar to those in the 2017 and 2018 Job Orders and H-2A Applications as well as the same job description as set forth in Paragraph 53.

56.     Upon information and belief, Defendants' Job Orders and H-2A Applications with dates of need in 2016, 2017 and 2018 were approved by USDOL.

57.     Upon information and belief, with approval from USDOL, Defendants obtained H-2A visas to employ foreign machine operators in 2016, 2017 and 2018.

58.     Plaintiff Davel filled a position requested in Defendants' 2016, 2017 and 2018 Job Orders and H-2A Applications.

59.     Plaintiff Victor filled a position requested in Defendants' 2017 and 2018 Job Orders and H-2A Applications.

60.     Defendants' 2018 H-2A Application for the positions filled by Plaintiffs included each of the required elements described in Paragraph 45 and 20 C.F.R. § 655.135, including commitments to follow all applicable state and federal laws and not to retaliate against workers exercising their contractual rights.

61.     Upon information and belief, Defendants' H-2A Application for the positions filled by Plaintiffs in 2017 included each of the required elements described in Paragraph 45 and

20 C.F.R. § 655.135, including commitments to follow all applicable state and federal laws and not to retaliate against workers exercising their contractual rights.

62.     Defendants' 2018 Job Order did not specify any additional deductions not otherwise required by law.

63.     For each of these years, the Job Order for the positions filled by Plaintiffs included each of the required elements described in Paragraph 43 and 20 C.F.R. §§ 655.122 & 653.501, including payment of the higher of the AEWR, the prevailing wage, or the minimum wage required by state and federal wage laws, meals or cooking facilities, free housing, transportation and board, and pay periods twice a month. Defendants' 2018 Job Order is attached hereto as Exhibit A and incorporated by reference into this Complaint.

64.     Upon information and belief, Defendants 2017 Job Order did not specify additional deductions not otherwise required by law.

65.     Upon information and belief, the hourly wage offered in Defendants' 2017 Job Order was $13.80.

66.     The hourly wage offered in Defendants' 2018 Job Order was $13.80.

67.     The federal minimum wage in 2017 and 2018 was $ 7.25 per hour.

68.     The Colorado minimum wage in 2017 was $9.30 per hour. In 2018, it was $10.20 per hour.

69.     The AEWR (the wage set by regulation for H-2A workers) in Colorado for 2017 was $11.00 per hour[1] and for 2018, the AEWR was $10.69 per hour.[2]

---

[1] U.S. Dep't of Labor, *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: 2016 Adverse Effect Wage Rates*, 81 Fed. Reg. 94422 (Dec. 23, 2016).
[2] U.S. Dep't of Labor, *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: 2016 Adverse Effect Wage Rates*, 82 Fed. Reg. 60628 (Dec. 21, 2017).

70.     The prevailing wage for long-haul truck drivers (OES/SOC 53-3032 "Heavy and Tractor-Trailer Truck Drivers") in Morgan County, Colorado in 2017 was $24.01 per hour and $20.65 per hour in 2018.

71.     In 2018, Plaintiff Davel and Defendants signed a contract reflecting a date of May 15, 2018 (the "Davel Employment Contract"), attached hereto as Exhibit B and incorporated by reference into this Complaint.

72.     The Davel Employment Contract stated a term of employment from April 19, 2018, through November 30, 2018.[3]

73.      The Davel Employment Contract stated that Plaintiff Davel would be employed as a "General Farm Hand" and receive an hourly wage of $15.00.

74.     The Davel Employment Contract stated that Plaintiff Davel would be paid for each and every hour worked and that he would receive his wages every 14 days.

75.     The Davel Employment Contract stated that Plaintiff Davel would receive free housing and meals in accordance with federal regulatory requirements and that Plaintiff Davel would be reimbursed for costs of transportation from South Africa to the end destination.

76.     Upon information and belief, Plaintiff Davel also signed similar employment contracts with Defendants in 2016 and 2017.

77.     In 2018, Plaintiff Victor and Defendants signed a contract reflecting a date of May 15, 2018 (the "Victor Employment Contract"), attached hereto as Exhibit C and incorporated by reference into this Complaint.

---

[3] As stated in Paragraph 123 of this Complaint, the end date of this contract was extended through December 10, 2018.

78.     The Victor Employment Contract stated a term of employment from June 2018 through November 30, 2018.[4]

79.     The Victor Employment Contract described Plaintiff as a "General Farm Hand" and provided that Plaintiff Victor would be paid an hourly wage of $15.00.

80.     The Victor Employment Contract stated that Plaintiff Victor would be paid for each and every hour worked and that he would be paid every 14 days.

81.     The Victor Employment Contract stated that Plaintiff Victor would receive free housing and meals in compliance with federal regulatory requirements and that Plaintiff Victor would be reimbursed for costs of transportation from South Africa to the end destination.

82.     Upon information and belief, Plaintiff Victor also signed a similar employment contract with Defendants in 2017.

**Defendants' Employment of Plaintiffs**

83.     Each year Plaintiffs worked for Defendants; Plaintiffs came to the U.S. on an H-2A Visa to work as machine operators.

84.     In early 2017, Defendants contacted Plaintiffs in their hometowns in South Africa and informed them to begin the visa process to come work for Defendants.

85.     In order to get from South Africa to Fort Morgan, Colorado, to commence work under the above described work contracts, Plaintiffs had to pay various fees and expenses, including, but not limited to, processing fees, visa fees, hotel expenses and subsistence expenses.

---

[4] As stated in Paragraph 123 of this Complaint, the end date of this contract was extended through December 10, 2018.

86.     Plaintiff Davel estimates that he spent approximately $300.00 USD in 2017 on lodging, transportation and subsistence expenses incurred during his travels to the U.S. Embassy in South Africa to complete the process to obtain his H-2A visa.

87.     Plaintiff Victor estimates that he spent approximately $300.00 USD in 2017 on lodging, transportation and subsistence expenses incurred during his travels to the U.S. Embassy in South Africa to complete the process to obtain his H-2A visa.

88.     In 2017, Plaintiffs worked with CV Personnel to assist with the paperwork and consular process in order to obtain their H-2A visas.

89.     Plaintiff Davel estimates that he paid approximately $250.00 USD in 2017 to CV Personnel for the assistance they provided in obtaining his H-2A visa.

90.     Plaintiff Victor estimates that he paid approximately $270.00 USD in 2017 to CV Personnel for the assistance they provided in obtaining his H-2A visa.

91.     Plaintiffs were additionally required to pay the visa application fee of $190.00 USD.

92.     After receiving their H-2A visas, Plaintiffs purchased their airplane tickets to come to Colorado to work for Defendants.

93.     Plaintiffs estimate that they spent the same amount in airfare in 2017 as they did in 2018.

94.     The expenditures described in Paragraphs 85 through 93 were primarily for the benefit of Defendants as Plaintiffs' employer.

95.     Plaintiffs made these expenditures before the receipt of their first paycheck.

96.     Upon information and belief Defendants did not reimburse Plaintiffs for these expenditures to the extent that they brought Plaintiffs' first week's wages below the federal minimum wage in 2017.

97.     In 2017, Plaintiff Davel worked for Defendants from approximately May 2017 to December 2017.

98.     In 2017, Plaintiff Davel performed long-haul truck driving for approximately three months for Defendants and spent the remainder of his contract performing grain cleaning for Defendants.

99.     In 2017, Plaintiff Victor worked for Defendants from approximately June 2017 to December 2017.

100.    In 2017, Defendants trained Plaintiff Victor on long-haul truck driving and assigned him to work as a long-haul truck driver and perform grain cleaning work.

101.    At the end of Plaintiffs' employment contracts in 2017, Defendant Milton Greenbank requested each of them to return in 2018 to work for Defendants through the H-2A Visa Program.

102.    In early 2018, Defendant Milton Greenbank contacted Plaintiffs and requested them to return to the United States to work for Defendants through the H-2A Visa Program.

103.    In 2018, Plaintiff Davel estimates that he spent approximately $300.00 USD on the same fees and expenses he incurred the previous year, including, but not limited to, processing fees, visa fees, hotel expenses and subsistence expenses.

104.   Plaintiff Victor estimates that he spent approximately $300.00 USD on the same fees and expenses in 2018 as he incurred the previous year, including, but not limited to, processing fees, visa fees, hotel expenses and subsistence expenses.

105.   Plaintiffs again worked with CV Personnel in 2018 to assist with the paperwork and consular process in order to obtain their H-2A visas.

106.   Plaintiff Davel estimates that he paid approximately $250.00 USD in 2018 to CV Personnel for the same or similar assistance with the visa process they had provided the prior year.

107.   Plaintiff Victor estimates that he paid approximately $270.00 USD in 2018 to CV Personnel for the same or similar assistance with the visa process they had provided the prior year.

108.   In 2018, Plaintiffs were additionally required to pay the visa application fee of $190.00 USD.

109.   After receiving their H-2A visas, Plaintiffs purchased their airplane tickets to come to Colorado to work for Defendants.

110.   In 2018, Plaintiff Davel purchased a round trip ticket in the approximate amount of $1,301.00 USD to come to the United States to work for Defendants.

111.   In 2018, Plaintiff Victor purchased a round trip ticket in the approximate amount of $1,946.00 USD to come to the United States to work for Defendants.

112.   The expenditures described in Paragraphs 103 through 111 were primarily for the benefit of Defendants as Plaintiffs' employer.

113.   Plaintiffs made these expenditures before the receipt of their first paycheck.

114.    Defendants did not reimburse Plaintiffs for these expenditures to the extent that they brought Plaintiffs' first week's wages below the federal minimum wage in 2018.

115.    In 2018, Plaintiff Davel was issued an H-2A visa valid from April 10, 2018 to November 30, 2018 to work for Defendants.

116.    Plaintiff Davel arrived in the United States on or around April 18, 2018 and returned to South Africa on or around December 10, 2018.

117.    In 2018, Plaintiff Davel performed long-haul truck driving for Defendants from April 2018 through early July 2018 and again performed long-haul truck driving at the end of his contract from the end of September 2018 until he returned to South Africa in December 2018. Plaintiff Davel spent the majority of his time from July 2018 through September 2018 performing grain cleaning for Defendants.

118.    Plaintiff Victor was approved for an H-2A visa valid from June 19, 2018 to November 30, 2018 to work for Defendant Greenbank Harvesting.

119.    Plaintiff Victor arrived in the United States on or around June 23, 2018 and returned to South Africa on or around December 10, 2018.

120.    In 2018, Plaintiff Victor performed long-haul truck driving for Defendants from June 2018 to mid-July 2018 and then again from November 2018 until he returned to South Africa in December 2018. From mid to end of July 2018 through October 2018, Plaintiff Victor performed grain cleaning for Defendants.

121.    In 2018, Defendants agreed to pay Plaintiffs an additional amount of $20 per day to reimburse each of them for meals when not at housing with cooking and kitchen facilities.

122.    Plaintiffs' employment contracts were to expire November 30, 2018.

123.     Defendants requested that Plaintiffs stay longer in order to complete additional long-haul truck driving assignments, and Plaintiffs agreed to stay in the United States through December 10, 2018.

124.     Since Plaintiffs had already purchased their return flights to South Africa to correspond with the end date of their employment contracts, Plaintiffs incurred additional charges in order to change their return flight to a later date to accommodate Defendants' request.

125.     Plaintiff Davel incurred additional charges in the amount of $677.00 USD to change his return flight to South Africa, which increased the total amount he paid for his airfare to and from South Africa to $1,978.00.

126.     Plaintiff Victor incurred additional charges in the amount of $597.00 USD to change his return flight to South Africa, which increased the total amount he paid for his airfare to and from South Africa to a total of $2,543.00.

127.     Defendants did not reimburse Plaintiffs for the amount they spent on their airfare to and from South Africa to come to the United States to works for Defendants in 2018.

128.     At the conclusion of their employment contracts in 2018 and prior to returning to South Africa, Defendants notified Plaintiffs that Defendants would apply to bring each of them back to work for them the following year through the H-2A program.

**Long-Haul Truck Driving**

129.     At all times relevant to this Complaint, when Plaintiffs performed long-haul truck driving for Defendants, Plaintiffs hauled a variety of products, including but not limited to bulk commodities, urea, grain, bone meal, chicken meal, fish meal, beef meal, dog food, golf sand, salt, coal, and lava rocks.

130.    Upon information and belief, none of the long-haul truck driving performed by Plaintiffs for Defendants qualified as agricultural labor or services.

131.    Initially in 2017, Defendants paid Plaintiffs hourly, but then Defendants began paying Plaintiffs per mile when performing long-haul truck driving for Defendants.

132.    While performing long-haul truck driving for Defendants, Plaintiffs kept track of their mileage and submitted their mileage documentation to Defendants approximately every 14 days.

133.    In 2018, Defendants required Plaintiffs to pay for all truck washouts in between trips and maintenance and other expenses related to the long-haul truck driving out of their own pocket and submit the receipts to Defendants to get reimbursed.

134.    The expenditures related to the maintenance and upkeep of the truck were primarily for the benefit of Defendants as Plaintiffs' employer and as such are "de facto deductions" from Plaintiffs' wages.

135.    Defendants also deducted amounts from Plaintiffs' wages to pay for repairs for alleged damage to Defendants' vehicles and equipment Plaintiffs had allegedly caused during the regular course of work.

136.    Upon information and belief, these deductions were also not included on the 2017 H-2A Job Order.

137.    These deductions were not included on the 2018 H-2A Job Order. Pursuant to Colo. Rev. Stat. §8-4-105, deductions for loans, advances, goods or services and equipment or property provided by an employer to an employee must be included in a revocable, written agreement in accordance with Colorado law.

<u>Plaintiff Davel</u>

138.    In 2017, Plaintiff Davel performed long-haul truck driving for Defendants from approximately May 2017 to July 2017 and again from approximately October 2017 to December 2017.

139.    In 2017, when Defendants began paying Plaintiff Davel by the mile, he received a rate of approximately 35 cents per mile when performing long-haul trucking, instead of an hourly wage.

140.    Defendants increased Plaintiff Davel's rate to approximately 40 cents per mile.

141.    At all times relevant to this Complaint, Plaintiff Davel estimates that he drove approximately 8,500 miles every two weeks when performing long-haul truck driving for Defendants.

142.    Plaintiff Davel estimates that he drove an average of 600 miles per day and that he drove for an average of 14 hours each day.

143.    Upon information and belief, Plaintiff Davel earned less than the prevailing wage for long-haul truck drivers for all the weeks he spent performing long-haul truck driving for Defendants in 2017.

144.    On or around September or October 2017, Defendants deducted approximately $1,700.00 USD from Plaintiff Davel's wages to pay for repairs to one of Defendants' machines that had been damaged during the regular course of work.

145.    In 2018, Defendants agreed to pay Plaintiff Davel at the rate of 45 cents per mile when performing long-haul trucking for Defendants.

146.     In 2018, Plaintiff Davel performed long-haul truck driving for Defendants from approximately April 19, 2018 until on or around July 7, 2018 and again from approximately September 23, 2018 through December 8, 2018.

147.     Plaintiff Davel incurred numerous expenses while performing long-haul trucking for Defendants before the receipt of his paycheck for the workweeks the work was performed.

148.     The expenses Plaintiff Davel was required to incur were for the maintenance and upkeep of the truck he was driving for Defendants, including paying for gas and toll fees.

149.     There was no written agreement between the parties for the de facto deductions Defendants took from Plaintiff Davel's wages while performing long-haul truck driving for Defendants.

150.     Defendants did not pay Plaintiff Davel for several workweeks in 2018 during which he performed long-haul truck driving for Defendants, including his first several weeks of work.

151.     For example, Defendants did not pay Plaintiff Davel any wages in April 2018 or December 2018.

152.     Defendants also did not reimburse Plaintiff Davel for any of the visa related expenses described in Paragraphs 103 through 111 in April 2018.

153.     In 2018, Defendants deducted approximately $1,800.00 USD from Plaintiff Davel's wages to pay for repairs to one of Defendants' machines that had been damaged during the regular course of work.

<u>Plaintiff Victor</u>

154.    In 2017, Defendants asked Plaintiff Victor to obtain his Commercial Driver's License, and Plaintiff Victor incurred expenses to obtain his Commercial Driver's License in order to work for Defendants in long-haul truck driving.

155.    At Defendants' instruction, Plaintiff Davel trained Plaintiff Victor for approximately two weeks in long-haul truck driving.

156.    Defendants did not pay Plaintiff Victor for this training time.

157.    Plaintiff Victor performed long-haul truck driving for Defendants from approximately October 2017 to December 2017.

158.    In 2017, when Defendants began paying Plaintiff Victor by the mile, he received a rate of approximately 40 cents per mile when performing long-haul trucking, instead of an hourly wage.

159.    At all times relevant to this Complaint, Plaintiff Victor estimates that he drove approximately 8,500 miles every two weeks when performing long-haul truck driving for Defendants.

160.    Plaintiff Victor estimates that he drove an average of 600 miles per day and that he drove for an average of 14 hours each day.

161.    Upon information and belief, Plaintiff Victor earned less than the prevailing wage for long-haul truck drivers for all the weeks he spent performing long-haul truck driving for Defendants in 2017.

162.    In 2018, Defendants agreed to pay Plaintiff Victor at the rate of 40 cents per mile when performing long-haul truck driving.

163.    Defendants assigned Plaintiff Victor to perform long-haul truck driving from approximately June 24, 2018 to July 21, 2018 and then again from approximately November 1, 2018 through December 8, 2018.

164.    Plaintiff Victor incurred numerous expenses while performing long-haul trucking for Defendants before the receipt of a paycheck for the workweeks the work was performed.

165.    The expenses Plaintiff Victor was required to incur were for the maintenance and upkeep of the truck he was driving for Defendants, including paying for gas and toll fees.

166.    There was no written agreement between the parties for the de facto deductions Defendants took from Plaintiff Victor's wages while he was performing long-haul truck driving for Defendants.

167.    Defendants did not pay Plaintiff Victor for several workweeks in 2018 during which he performed long-haul truck driving for Defendants, including his first several weeks of work.

168.    For example, Defendants did not pay Plaintiff Victor any wages in June 2018 or December 2018.

169.    Defendants also did not reimburse Plaintiff Victor for any of the visa related expenses described in Paragraphs 103 through 111 in June or July 2018.

**Plaintiffs' Grain Cleaning Work**

170.    Pursuant to Colorado Wage Order Numbers 33 and 34, 7 CCR 1103-1, employees working in certain industries, including Commercial Support Services, shall be paid time and one-half of the regular rate of pay for any work in excess of 40 hours per workweek, 12 hours

per workday or twelve consecutive hours worked, whichever calculation results in the greatest payment of wages.

171.    Grain cleaning is a commercial service Defendants perform for farms and other businesses.

172.    At all times relevant to this Complaint, the grain cleaning work Plaintiffs performed for Defendants was not "agricultural" work.

173.    Grain cleaning is an elective service whereby farmers or grain owners may choose to clean their grain before use or sale.

174.    Many farmers do not own grain cleaning equipment as a part of their farming operations and instead occasionally employ grain cleaning companies to come clean their grain if needed.

175.    At all times relevant to this Complaint, Plaintiffs went to various locations to operate machinery to clean grain for businesses and entities, including grain elevators and other large storage sites, seed dealers and farmers for various purposes.

176.    On many occasions there would be numerous farmers who would arrive at one site to use Defendants' grain cleaning services.

177.    Upon information and belief, most of the grain Plaintiffs cleaned at the grain elevators and large storage facilities had not been harvested or produced at the location or by the owner or operator of where the grain was cleaned.

178.    During the time periods Plaintiffs performed grain cleaning for Defendants, Plaintiffs spent at least a portion of each workweek performing non-exempt grain cleaning work for Defendants.

179.    During the time periods Plaintiffs performed grain cleaning for Defendants, Plaintiffs cleaned grain at grain elevators, at large storage facilities and/or at locations that had multiple farmers come to clean grain at one site.

180.    Plaintiffs were paid an hourly wage when performing grain cleaning for Defendants.

<u>Plaintiff Davel</u>

181.    In 2017, Plaintiff Davel worked in grain cleaning for Defendants from approximately end of June 2017 until mid-October 2017.

182.    In 2017, Plaintiff Davel was paid approximately $15.00 per hour for grain cleaning.

183.    During the time period in which Plaintiff Davel was performing grain cleaning for Defendants, Plaintiff Davel routinely worked hours in excess of 40 in a workweek.

184.    Defendants did not pay Plaintiff Davel an increased overtime rate for hours worked in excess of 40 hours in any workweek during his employment.

185.    For example, when Plaintiff Davel worked on a grain cleaning job in July 2017, he frequently worked over 60 hours each workweek and was compensated for all hours worked during that workweek at his regular rate of pay per hour.

186.    In, 2018, Plaintiff Davel worked in grain cleaning for Defendants from approximately July 8, 2018 to September 22, 2018.

187.    In 2018, Plaintiff Davel was paid approximately $15.00 per hour and then Defendants increased his pay to approximately $17.50 an hour for grain cleaning.

188.    During the time period from July 7, 2018 through September 2018 in which Plaintiff Davel was performing grain cleaning for Defendants, Plaintiff Davel routinely worked hours in excess of 40 in a workweek.

189.    Defendants did not pay Plaintiff Davel an increased overtime rate for hours worked in excess of 40 hours in any workweek during his employment.

190.    For example, Plaintiff Davel worked over 80 hours each workweek from July 9, 2018 through July 31, 2018 and was compensated for all hours worked during that workweek at his regular rate of pay per hour.

191.    Upon information and belief, Plaintiff Davel was not provided meals or cooking facilities nor did he receive the $20 per day for meals from Defendants during this time period.

Plaintiff Victor

192.    In 2017, Plaintiff Victor worked in grain cleaning for Defendants from approximately June 2017 through September 2017.

193.    In 2017, Plaintiff Victor was paid approximately $14.00 per hour for grain cleaning.

194.    During the time period from June 2017 through September 2017 in which Plaintiff Victor was performing grain cleaning for Defendants, Plaintiff Victor routinely worked hours in excess of 40 in a workweek.

195.    Defendants did not pay Plaintiff Victor an increased overtime rate for hours worked in excess of 40 hours in any workweek during his employment.

196.    In 2018, Plaintiff Victor worked in grain cleaning for Defendants from approximately July 23, 2018 through the end of October 2018.

197.    Plaintiff Victor was paid $15.00 per hour for grain cleaning in 2018.

198.    During the time period from approximately July 22 through the end of October 2018 in which Plaintiff Victor was performing grain cleaning for Defendants, Plaintiff Victor routinely worked hours in excess of 40 in a workweek.

199.    Defendants did not pay Plaintiff Victor an increased overtime rate for hours worked in excess of 40 hours in any workweek during his employment.

**Assertion of Rights and Unlawful Retaliation**

200.    At the conclusion of their employment with Defendants in 2018, Plaintiffs requested the wages and other amounts owed to each of them by Defendants but did not receive the amounts owed.

201.    Plaintiffs sought the assistance of an attorney to recover the wages owed to each of them and to enforce their rights under the FLSA and the employment contracts.

202.    On or around January 24, 2019, through counsel, Plaintiffs contacted Defendants and asserted that Defendants' payment practices violated their rights under the FLSA and Colorado Wage laws and demanded payment for all wages owed.

203.    Following Plaintiffs' correspondence, Defendants retaliated against Plaintiffs by notifying Plaintiffs that they would not be re-hired by Defendants for the subsequent year (2019) if they continued to utilize an attorney to seek their wages.

204.    Defendants did not re-hire Plaintiffs to work for Defendants in 2019.

205.    Defendants did, however, hire other South Africans to come work for Defendants through the H-2A Program in 2019.

206.    Defendants further retaliated against Plaintiffs by alleging Plaintiffs had damaged Defendants' property and owed large sums to Defendants.

207.    Defendants informed Plaintiffs that the deductions for the alleged damages would be deducted from wages owed to Plaintiffs.

### FIRST CLAIM: FAIR LABOR STANDARDS ACT – MINIMUM WAGE

208.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

209.    Plaintiffs were "employees" as that term is defined by the FLSA. 29 U.S.C. § 203(e).

210.    Defendants "employed" Plaintiffs as that term is defined by the FLSA. 29 U.S.C. § 203(g).

211.    Defendants were Plaintiffs' "employers" as that term is defined by the FLSA. 29 U.S.C. § 203(d).

212.    Defendants employed Plaintiffs in an enterprise "engaged in commerce or in the production of goods for commerce" as defined by 29 U.S.C. § 203(s)(1).

213.    Defendants were required to pay Plaintiffs at least the federal minimum wage for every compensable hour of labor performed in a workweek pursuant to 29 U.S.C. § 206(a).

214.    The violations set forth in this Claim resulted, in part, from Defendants' failure to pay Plaintiffs for their first weeks of work.

215.    The violations set forth in this Claim resulted, in part, from Defendants' failure to reimburse the expenses incurred by Plaintiffs primarily for the benefit of the Defendants.  These expenses brought Plaintiffs' earnings below the required minimum hourly wage rate.

216.    The violations set forth in this Claim resulted, in part, from Defendants' de facto deductions of Plaintiffs' wages taken by Defendants during the workweeks in which Plaintiffs were performing long-haul truck driving for Defendants that brought Plaintiffs' earnings below the minimum wage.

217.    These de facto deductions were also primarily for the benefit and convenience of Defendants.

218.    The violations set forth in this Claim resulted, in part, from Defendants failure to pay Plaintiffs at least the minimum wage for work performed for several workweeks during which time Plaintiffs were performing long-haul truck driving for Defendants.

219.    As a result of Defendants' violations set forth in this Claim, Plaintiffs suffered injury.

220.    Pursuant to 29 U.S.C. § 216(b), as a result of Defendants' violation of the FLSA set forth in this Claim, Plaintiffs are entitled to recover the amount of their  unpaid wages for each workweek in which they were suffered or permitted to work for Defendants in an amount to be determined at trial, and are entitled to the recovery of such amounts, liquidated damages, pre- and post-judgment interest, their reasonable attorneys' fees, costs, and such other compensation and legal remedies; and additionally, such declaratory and injunctive or other equitable relief, as the law allows.

## SECOND CLAIM: FAIR LABOR STANDARDS ACT – OVERTIME

221.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

222.    Defendants failed to pay Plaintiffs at least the required hourly wage of one and a half times the regular rate of compensation for every compensable hour of labor performed in a workweek in excess of 40 hours, as required by 29 U.S.C. § 207(a).

223.    The violations set forth in this Claim resulted, in part, from Defendants' failure to pay Plaintiffs' overtime premiums for hours worked beyond 40 during work weeks in which Plaintiffs performed non-exempt work for Defendants in 2017 and 2018.

224.    Defendants violations of the FLSA were willful, because all Defendants knew, or showed reckless disregard as to whether their actions violated the FLSA. 29 U.S.C. § 255(a).

225.    As a result of Defendants' violation of the FLSA, Plaintiffs have suffered damages by failing to receive appropriate wages for all hours worked.

226.    Pursuant to 29 U.S.C. § 216(b), as a result of Defendants' violations of the FLSA set forth in this Claim, Plaintiffs are entitled to recover the amount of their unpaid overtime compensation for each workweek in which they were suffered or permitted to work for Defendants in an amount to be determined at trial, and are entitled to the recovery of such amounts, liquidated damages, pre- and post-judgment interest, their reasonable attorneys' fees, costs, and such other compensation and legal remedies; and additionally, such declaratory and injunctive or other equitable relief, as the law allows.

### THIRD CLAIM: FAIR LABOR STANDARDS ACT – RETALIATION

227.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

228.    The violations set forth in this Claim resulted from Defendants discriminatory actions against Plaintiffs after Plaintiffs engaged in a protected activity.

229.     Plaintiffs engaged in protected activity by asserting their rights under the FLSA and/or by reporting and demanding their unpaid wages from Defendants.

230.     Defendants responded to Plaintiffs' protected activity by withdrawing Defendants' offer of employment to Plaintiffs for the following year, 2019.

231.     Defendants responded to Plaintiffs' protected activity by alleging additional improper deductions from Plaintiffs' wages based on allegations of property damage.

232.     Defendants violated the FLSA by discriminating against the Plaintiffs. 29 U.S.C. § 215(a)(3).

233.     As a result of Defendants' conduct, Plaintiffs suffered damages.

234.     Plaintiffs are entitled to such legal or equitable relief as may be appropriate to effectuate the purposes of 29 U.S.C. § 215(a)(3). 29 U.S.C. § 216(b).

235.     Plaintiffs seek the payment of wages lost, and additional equal amount as liquidated damages, punitive damages, reasonable attorneys' fees and costs. 29 U.S.C. § 216(b).

## FOURTH CLAIM: COLORADO WAGE LAWS – FAILURE TO PAY WAGES

236.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

237.     This claim arises under Colo. Rev. Stat. §§ 8-4-101 *et seq.* and 8-6-101 *et seq.* and Article XVIII, Section 15 of the Colorado Constitution.

238.     Defendants were Plaintiffs' "employer" as that term is defined by the CWCA and by the Wage Order because they employed the Plaintiffs in Colorado. Colo. Rev. Stat. § 8-4-101(6); 7 C.C.R. 1103-1(2).

239.    Plaintiffs were the "employees" of Defendants as that term is defined by the CWCA and by the Wage Order because they performed labor for the benefit of Defendants in which Defendants commanded when, where, and how much labor or services would be performed. Colo. Rev. Stat. § 8-4-101(5); 7 C.C.R. 1103-1(2).

240.    The violations set forth in this Claim resulted, in part, from Defendants' failure to pay Plaintiffs for their first weeks of work.

241.    The violations set forth in this Claim resulted, in part, from Defendants' failure to reimburse the expenses incurred by Plaintiffs primarily for the benefit of the Defendants.  These expenses brought Plaintiffs' earnings below the Colorado minimum hourly wage rate.

242.    The violations set forth in this Claim resulted, in part, from Defendants' de facto deductions of Plaintiffs' wages taken by Defendants during the workweeks in which Plaintiffs were performing long-haul truck driving for Defendants that brought Plaintiffs' earnings below the Colorado minimum wage.

243.    These de facto deductions were also primarily for the benefit and convenience of Defendants.

244.    The de facto deductions Defendants took from Plaintiffs' pay is in violation of Colo. Rev. Stat. § 8-4-105.

245.    The violations set forth in this Claim resulted, in part, from Defendants' improper deductions of Plaintiffs' wages in violation of 20 C.F.R. § 655.122(p)(1).

246.    The violations set forth in this Claim resulted, in part, from Defendants failure to pay Plaintiffs at least the Colorado minimum wage for work performed for several workweeks during which time Plaintiffs were performing long-haul truck driving for Defendants.

247.     The violations set forth in this Claim resulted, in part, from Defendants' failure to pay Plaintiffs' overtime premiums for work Plaintiffs performed in the "Commercial Support Service" industry regulated by the Wage Order in effect in 2017 and 2018. 7 C.C.R. 1103-1(2)(A).

248.     The violations set forth in this Claim resulted, in part, from Defendants' failure to pay Plaintiffs the required overtime wages in effect in Colorado for each workweek in which Plaintiffs worked in excess of 40 hours per week and/or 12 hours per day pursuant to Colorado wage laws.

249.     Defendants failed to pay Plaintiffs all wages or compensation due and owing to Plaintiffs in accordance with Colo. Rev. Stat. § 8-4-109.

250.     Plaintiffs made a written demand for wages after their employment ended with Defendants, as required by Colo. Rev. Stat. § 8-4-109(3), stating in the demand where payment was to be received.

251.     Defendants failed to tender and/or willfully failed to tender the full amount of wages owed within 14 days of receipt of the demand as required by Colo. Rev. Stat. § 8-4-109(3).

252.     Consequently, Plaintiffs are entitled to recover in this civil action the unpaid balance of the full amount of minimum and overtime wages they are each owed, together with reasonable attorneys' fees and court costs.  Colo. Rev. Stat. §§ 8-4-109, 8-4-110, 8-6-118; 7 C.C.R 1103-1(18).

## FIFTH CLAIM: BREACH OF CONTRACT

253.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

254.    Plaintiffs entered into employment contracts with Defendants in 2017.

255.    Plaintiffs entered into employment contracts with Defendants in 2018.

256.    Defendants' contract with Plaintiff Davel is described herein as the "Davel Employment Agreement" and Defendants' contract with Plaintiff Victor is described herein as the "Victor Employment Agreement."

257.    These employment contracts incorporated the obligations that were imposed on Defendants by federal law as a precondition of entering and maintaining the contractual relationship.

258.    These employment contracts incorporate the additional terms agreed to among the parties in regard to the payment of wages per mile for the time periods in which Plaintiffs performed long-haul trucking for Defendants in 2017 and 2018.

259.    Plaintiffs performed their obligations under these contracts.

260.    Defendants breached these contracts by failing to comply with the terms and conditions of Plaintiffs' employment contained therein.

261.    In the alternative, Defendants agreed to abide by the terms of the H-2A Compliance Plan, as well as the H-2A provisions and implementing regulations, and Plaintiffs are intended third-party beneficiaries of those agreements.

262.    Defendants breached multiple provisions of the agreements by failing to comply with the terms of the H-2A Compliance Plan, as well as the H-2A provisions and implementing regulations.

263.    As a result of Defendants' conduct, Plaintiffs suffered damages.

## SIXTH CLAIM: PROMISSORY ESTOPPEL

264.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

265.    Defendants and their employees made promises to Plaintiffs.

266.    These promises included, but were not limited to, promises that Plaintiffs would be paid for every hour they worked.

267.    Defendants should have reasonably expected that such promises would induce action and/or forbearance by Plaintiffs.

268.    Plaintiffs were in fact induced to act and/or refrain from acting based on such promises made by Defendants.

269.    Defendants broke their promises to Plaintiffs.

270.    As a result of Defendants' conduct, Plaintiffs suffered damages.

271.    Injustice can only be avoided by the enforcement of Defendants' promises.

## SEVENTH CLAIM:  UNJUST ENRICHMENT /QUANTUM MERUIT

272.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs. Plaintiffs conferred a benefit to Defendants by laboring in their employ, with a value to be determined at trial.

273.    Defendants appreciated the benefits conferred upon them by Plaintiffs' work.

274.   Plaintiffs conferred this benefit upon Defendants at their own expense, because Defendants did not compensate them for the full value of their labor.

275.   Plaintiffs were unable to perform other work for the benefit of themselves of other employers while working for Defendants.

276.   Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them by Plaintiffs without payment.

277.   Plaintiffs are entitled to recover from Defendants all amounts that Defendants have wrongfully and improperly retained, and Defendants should be required to disgorge to Plaintiffs the benefits they have unjustly obtained.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their behalf and against Defendants and award them the following:

(a)    declaring that Defendants violated the FLSA;

(b)    declaring that Defendants breached the employment contracts with Plaintiffs;

(c)    declaring that Defendants breached the contracts with the USDOL of which Plaintiffs are third-party beneficiaries;

(d)    judgment in favor of Plaintiffs and awarding any unpaid wages and liquidated damages pursuant to the FLSA;

(e)    judgment in favor of Plaintiffs on their contract claims and awarding damages for Defendants' contractual breaches;

(f)    judgment in favor of Plaintiffs on their Colorado Wage Claim Act claim and awarding damages;

(g)     liquidated damages as allowed by law on Plaintiffs' claim for relief under the FLSA;

(h)     penalty damages as allowed by law on Plaintiffs' claim for relief under the Colorado Wage Claim Act;

(i)     attorneys' fees and costs as provided for by law; and

(j)     pre- and post-judgment interest, costs and expert witness fees, and such other relief as the Court deems just and proper.

**PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 27th day of March 2020.

**COLORADO LEGAL SERVICES**

s/Jenifer C. Rodriguez
_____

Jenifer C. Rodriguez
Lauren Y. Shapiro
Migrant Farm Worker Division
Colorado Legal Services
1905 Sherman Street, Suite 400
Denver, CO 80203
Tel. (303) 866-9366
Fax (303) 863-8589
jrodriguez@colegalserv.org
lshapiro@colegalserv.org

*Attorneys for Plaintiffs*